IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAMUEL BUSTAMANTE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1805 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice- | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM, OPINION, AND ORDER

This case is before the Court on Petitioner Samuel Bustamante's Petition for Writ of Habeas Corpus, and Respondent Nathaniel Quarterman's [1] Motion for Summary Judgment. Having carefully considered the Petition, the Summary Judgment Motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Bustamante's Petition for Writ of Habeas Corpus should be DENIED.

---

[1] The originally-named respondent in this case was Doug Dretke. Since Bustamante filed his petition, Nathaniel Quarterman replaced Dretke as Director of the Texas Department of Criminal Justice ("TDCJ") Correctional Institutions Division. Therefore, Quarterman is substituted as the respondent in this case.

I.  Background

Petitioner Samuel Bustamante, currently in the custody of the Texas Department of Criminal Justice, filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. Because this is Bustamante's first application for federal habeas relief, a brief history of the case is appropriate.[2]

On January 17, 1998, Walter Escamilla, Arthur Escamilla, Dedrick Depriest, and Bustamante planned a robbery. Walter suggested that the four of them go to the town of Rosenberg to go "shopping." According to Bustamante's confessions, "shopping" entailed finding a "wetback," or illegal Hispanic alien, after the bars closed, offering him a ride, taking him to a deserted location, beating him, and stealing his money and jewelry. Bustamante told Solomon Escamilla (Walter and Arthur's brother and Bustamante's brother-in-law) and Brandy Riha (the girlfriend of Bustamante's brother Bill) that he was going shopping in Rosenberg with Walter, Arthur, and Dedrick. The four men, traveling in Arthur's pickup truck, arrived in Rosenberg at about 2:00 a.m., just after the bars closed. At first the group had trouble finding a victim but, just as they were about to give up, they came upon Rafael Alvarado. Bustamante noted that Alvarado's clothes were in good condition and his watch looked like it was made of "real gold."

Alvarado offered to pay the driver of the truck to give him a ride across town. The men agreed, and Alvarado climbed into the bed of the pickup. Arthur Escamilla and Depriest sat in the truck cab while Bustamante, Walter Escamilla, and the victim sat in the truck bed. After about fifteen minutes, Bustamante asked Walter what he was going to do. Walter told Bustamante to wait but

---

[2] For the sake of convenience, the key facts surrounding the case are adopted largely from the opinion of the Texas Court of Criminal Appeals affirming Bustamante's conviction and sentence. *See Bustamante v. State*, 106 S.W.3d 738 (Tex.Crim.App. 2003). Divergence from, or expansion upon, the Texas Court of Criminal Appeals' recitation of the facts will be noted by a specific citation to the record.

Bustamante stood up and began stabbing Alvarado with a knife. Bustamante stabbed him ten times. When Alvarado tried to escape, Walter caught him by the shirt and made an effort to pull him back in. Bustamante also tried to pull Alvarado in, but Alvarado managed to break free and fell to the ground. Walter yelled at the driver of the truck to stop but, by the time he did, Bustamante and the others were unable to see Alvarado because of the darkness. Bustamante told Depriest that he wanted the victim's boots. After the men walked around the area for several minutes without finding the victim, Bustamante decided that they should leave. Depriest admitted that, had they found the victim, they probably would have robbed him. As the truck drove away, the others in the group remarked that Bustamante was crazy.

The police followed a trail of blood from the west city limits of Rosenberg to a ditch in Fort Bend county, where they found Alvarado's body. He was wearing a watch, a gold necklace, and a ring. He also had a hundred dollars in his pockets and his wallet was undisturbed. His death was caused by stab wounds to the heart and liver and the attendant loss of blood.

After returning from Rosenberg, Bustamante told Solomon and Richard Escamilla to wash the truck before daylight. There was blood in the bed of the truck and a hand-print on the tailgate. Bustamante told Solomon that things went wrong and that someone got in the way of what Bustamante does. Bustamante explained that he got hold of a man the night before and the man fell out of the truck. When Solomon showed Bustamante a story about the victim in the paper, Bustamante responded, "that's what I told you, nobody gets away," adding that when he kills somebody, he knows he killed him. Solomon and Richard joked with Bustamante by telling him not to stab them and trying to give him their money. Depriest claimed that the group did not formulate a robbery plot but traveled to Rosenberg to "have fun and party." He further stated that he assumed the group was going to drop Alvarado at his desired destination.

During the course of their investigation, police officers interviewed Bustamante's brother, Bill, and procured from him a signed, written statement in which he spoke of other "shopping" trips. During the guilt/innocence phase of trial, the State called Bill to testify, but he refused. At the State's request, the trial court granted Bill immunity for any testimony given at the trial and ordered him to testify. Bill Bustamante persisted in his refusal to testify and the trial court held him in contempt. His written statement, which was marked State's Exhibit 107, was never admitted into evidence. Another item was later marked as Exhibit 107 and admitted into evidence. The defense presented no evidence. 19 Tr. at 27.[3]

Both items marked "Exhibit 107" were included with the exhibits sent to the jury room. During jury deliberations on guilt, one of the jurors read the Bill Bustamante statement aloud while others listened with varying degrees of attentiveness. After the statement was read, the jurors became concerned about whether it was properly before them. As a result, the jury foreman sent a note to the trial judge asking, "Judge, can we use exhibit 107 in making our decision?" The trial judge subsequently discovered that Bill Bustamante's written statement was in the jury room and ordered it removed.

From questioning the foreman, the trial judge ascertained that the jurors were indeed inquiring about the Bill Bustamante statement. The trial judge proceeded to question each juror individually about the statement, how much of it he or she read or heard, whether it presented anything new, whether it influenced the juror, and whether the juror could follow an instruction to disregard the exhibit. Nine jurors said that they did not read the statement but heard some or all of it read. Three jurors said they read all or part of the statement aloud or to themselves. Of the twelve jurors, five said that they learned nothing new from the statement, three said that they learned that

---

[3] "Tr." refers to the transcript of Bustamante's trial.

Bustamante had "gone shopping" before, and four said they learned about an incident at a truck stop, after the murder, in which Bustamante apparently started to break into another vehicle occupied by a sleeping person. One juror said she also learned that Bustamante told his brother before leaving for Rosenberg that he intended to rob someone. Before being asked whether they could follow an instruction to disregard the statement, eight jurors said that the statement would not influence their decision. The other four were not asked that question. One juror told the court that a round of voting already occurred before the statement was read, and three jurors volunteered that they made up their minds before the statement was read. Several said that they were not paying much attention to the statement when it was read. Finally, all twelve jurors said that they could completely disregard the exhibit if instructed to do so.

After questioning all the jurors, the trial court brought them into the courtroom as a group and issued an instruction to disregard the Bill Bustamante statement:

> Members of the jury, now that I've had an opportunity to talk to each one of you 12 jurors individually, I need to give you an additional admonition; and that admonition is as follows: Because of the factors that we discussed here individually a few minutes ago, specifically that there were two State's exhibit number 107 marked in this case. Only the first State's exhibit 107 was actually admitted by me into evidence. That State's exhibit number 107 is this plat which is down here on the floor. That may be considered by you, and I'm answering your question now. That exhibit number 107 may be used in making your decision in this case. The second State's exhibit number 107 was mismarked. That purports to be a statement by Mr. Bill Bustamante. That State's exhibit number 107 was never put into evidence, and you are not to consider it as evidence of any kind for any purpose at any stage of this trial. You are to make a decision in this case based only on the law and the evidence, specifically the evidence which has been admitted before you for your consideration, which would be the physical pieces of evidence that are admitted and the testimony that you've heard from the witness stand in here. In short, you're not to use anything that you may have read or heard from the purported Bill Bustamante [sic] statement for any purpose whatsoever. That's an additional admonition that you are charged to follow.

After the jury went back to the jury room to deliberate, Bustamante moved for a mistrial. After hearing arguments on the matter, the trial court denied the motion. The jury returned a guilty verdict for the offense of capital murder, finding Bustamante guilty of murdering Alvarado while attempting to rob him. *See* Tex.Penal Code § 19.03(a)(2). Bustamante also complained about this matter in a motion for new trial, which the trial court denied. *Bustamante v. State*, 106 S.W.3d 738, 739-42 (Tex.Crim.App. 2003).

During the penalty phase, Jimmy Koons testified that he grew up in the same neighborhood as the Bustamante family. He related an episode in which Bustamante ran down the street holding a shotgun and looking for a man who apparently offended him in some way. Another time, Bustamante saw Koons and a friend talking to Bustamante's sister. Bustamante approached the three and asked his sister if the men were bothering her. Although she said they were not, Bustamante displayed a knife and threatened the two men, at one point holding the knife to the other man's throat. 21 Tr. at 54-69. The State also presented evidence of another murder that Bustamante committed with his brother, Bill. 22 Tr. at 1-26.

The defense called Dr. Walter Quijano, a clinical psychologist. Dr. Quijano testified about the various security levels within the TDCJ, and opined that Bustamante, based on his past record and the fact that he would be serving a life sentence, is likely to be nonviolent in prison. On cross examination, Dr. Quijano stated that Bustamante's age and past history of violence increase the likelihood that he will be violent in the future. 24 Tr. at 3-52.

Bustamante's brother Andy testified that Bustamante is the third of six children in the family. He described their parents as strict, and said that they were stricter with Bustamante than with the other children. As a child, Bustamante had a problem with bed wetting. His parents dealt with this problem by publicly embarrassing him. Bustamante was caught playing with matches when he was

6

six or seven years old. His mother punished him by setting his shirt on fire. Another time, she punished Bustamante by forcing him to put his hand into the flame on the stove. Other physical punishment was common. Andy described Bustamante as "a caring person" and hard working. He was surprised to learn that he was charged with capital murder. *Id.* at 53-97.

Bustamante's sister, Peggy Bustamante Gomez, substantially corroborated Andy's testimony. She added that their mother did not like Bustamante, and that Bustamante was generous with his siblings. *Id.* at 98-113. On cross examination, she admitted that Bustamante had prior convictions and frequently got into trouble at school. She described him as "hard to be around sometimes." *Id.* at 113-24.

Bustamante's aunt, Linda G. Aldape, also testified that Bustamante suffered physical and psychological abuse by his parents starting at a young age. She testified that Bustamante was a good child, but that his mother hated him and seemed to get a thrill out of torturing him. *Id.* at 126-55.

Dr. Fred Fason, a psychiatrist, examined Bustamante. Dr. Fason characterized the abuse Bustamante suffered as a child as "severe" and "sadistic." He diagnosed Bustamante with antisocial personality disorder. He also concluded that this abuse arrested Bustamante's emotional development such that he lacks the socialization that would otherwise prevent him from acting out on his impulses. The abuse also caused Bustamante to become a very angry person. Dr. Fason testified that people who suffer severe abuse as children often become violent adults and are more likely than the general population to develop antisocial personality disorder. *Id.* at 4-88.

The prosecution called Bustamante's sister, Nancy Escamilla, as a rebuttal witness. She testified that Bustamante was only disciplined as a child when he did something wrong, and that all the Bustamante children received the same treatment. She also testified that Bustamante once, as an adult, threatened their father with a knife. *Id.* at 89-104.

7

The jury found that there was a probability that Bustamante would commit future acts of criminal violence that would constitute a continuing threat to society, and that the mitigating evidence was insufficient to justify a sentence of life imprisonment. Accordingly, the trial court sentenced Bustamante to death. 24 Tr. at 163-66.

The Texas Court of Criminal Appeals affirmed Bustamante's conviction and sentence. *Bustamante v. State*, 106 S.W.3d 738 (Tex.Crim.App. 2003), and denied his application for postconviction relief, *Ex Parte Bustamante*, No. 58,927-01 (Tex.Crim.App. May 19, 2004). Bustamante filed this timely federal petition for a writ of habeas corpus on May 19, 2005.

## II.   Discussion

### A.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court

arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies

the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

B. <u>The Standard for Summary Judgment in Habeas Corpus Cases</u>

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000). Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases. *See* Rule 11 of the Rules Governing Section 2254 Cases. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S.

539, 547 (1981); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir.), *cert. denied sub nom Foster v. Epps*, 537 U.S. 1054 (2002); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998). Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

    C.    Summary Judgment in the Instant Case

Bustamante asserts that: (1) His trial counsel rendered ineffective assistance by failing to inspect the exhibits before they were sent to the jury room; and (2) Texas' method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment.

    1.    Ineffective Assistance Of Counsel

In his first claim for relief, Bustamante contends that his trial counsel rendered ineffective assistance by failing to inspect the exhibits before they were sent to the jury room. If counsel inspected the exhibits, the jury would never have seen Bill Bustamante's statement. Bustamante argues that absent Bill Bustamante's statement, the jury would not have convicted him of capital murder because it would not have found that the murder occurred during the course of an attempted robbery.

To prevail on a claim for ineffective assistance of counsel, a petitioner ordinarily

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective

11

standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688. Review of counsel's performance is deferential. *Id.* at 689.

          a.      <u>The Applicable Standard</u>

Bustamante argues, however, that this is not an ordinary ineffective assistance of counsel claim, governed by *Strickland*. Rather, he argues that the facts of this case are tantamount to a complete denial of counsel, with prejudice presumed. *See United States v. Cronic*, 466 U.S. 648 (1984). Bustamante also makes the parallel argument that the jury viewing Bill Bustamante's statement was a "structural defect" in the trial, requiring habeas relief. "[S]tructural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error' standards. The existence of such defects-deprivation of the right to counsel, for example-requires automatic reversal of the conviction because they infect the entire trial process." *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993) (citation omitted).

The *Cronic* presumption of prejudice takes effect when there has been a complete denial of counsel, or "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . ." *Cronic*, 466 U.S. at 659. Under such circumstances, "there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* Such is not the case here.

In this case, Bustamante had counsel who aggressively cross examined the State's witnesses and raised appropriate objections. This claim arises over a document that improperly made its way into the jury room. This is simply an error in the submission of exhibits to the jury, not the complete absence of counsel or of an adversarial testing of the State's case. Its effect can be measured against the properly admitted evidence to determine the prejudice, if any, caused by the error. Therefore,

12

this case falls under *Strickland*. For the same reason – because it is plainly amenable to harmless error analysis – this error does not constitute a structural defect.

                    b.        *Strickland* Prejudice

As noted above, *Strickland* requires showing both deficient performance by counsel *and* prejudice. The parties argue at great length as to whether counsel rendered deficient performance and whether the jurors received and considered Bill Bustamante's statement. It is not necessary to address these arguments, however, because the record demonstrates that, regardless of whether counsel was deficient and regardless of whether the jurors considered the Bill Bustamante statement, Bustamante suffered no prejudice under *Strickland*.

The properly admitted evidence shows that Solomon Escamilla testified that he, Bustamante and the other accomplices planned to go to Rosenberg to go "shopping." Bustamante, in his own confession, acknowledges that "shopping" meant picking up a Hispanic alien for the purpose of robbing him. Bustamante specifically stated:

> Walter [Escamilla] came up with the idea to go to Rosenberg shopping. What I mean by shopping is to find a wetback after the bars close, pick him up by making him think we are giving him a ride, take him out somewhere that is deserted and to beat him and take his money and jewelry off of him. We left Solomon and Nancy's house in El Campo. Nancy is my sister and Solomon is her husband . . . We got to Rosenberg before the bars closed. We rode around for about an hour and a half cruising around that area. The bars had closed, and we were about to give up when we were in the street in front of a bar . . . A wetback . . . approached Arthur [Escamilla] and said that he needed a ride home and he would pay him.

18 Tr. at 95-96. Bustamante goes on to describe how he stabbed Alvarado until Alvarado escaped from the bed of the moving pickup truck. Alvarado, of course, died from his stab wounds.

Bustamante's confession makes clear that Bustamante knew the plan was to go "shopping," that he knew that "shopping" meant robbing a Hispanic alien, and that Bustamante joined in the plan

13

to do so. There is little doubt that Bustamante's confession alone is powerful evidence that he murdered Alvarado while attempting to rob him. While the jury could have seen the fact that Alvarado still had his valuables when police found his body as evidence that there was no robbery, it could also have seen this as nothing more than evidence that Alvarado got away before Bustamante was able to take his valuables from him. In light of Bustamante's confession and the other evidence, including Solomon Escamilla's testimony, there is little doubt that the jury would have found that the murder occurred during an attempted robbery, even without Bill Bustamante's statement. At a minimum, the Texas habeas court's conclusion on this point is not unreasonable in light of all the evidence. Under the AEDPA, this conclusion is entitled to deference. Therefore, Bustamante fails to demonstrate prejudice and he is not entitled to relief on this claim.

### 2. Lethal Injection

In his second claim for relief, Bustamante argues that the method the State of Texas intends to use to execute him violates the Eighth Amendment prohibition on cruel and unusual punishments. Since Bustamante filed this petition, the Supreme Court has held that challenges to the method of execution are properly brought in a civil rights action under 42 U.S.C. § 1983, and not in a petition for a writ of habeas corpus. *See Hill v. McDonough*, ___ U.S. ___, 126 S.Ct. 2096 (2006). As the Court previously explained:

> Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U. S. C. §2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. §1979, as amended, 42 U. S. C. §1983. Challenges to the lawfulness of confinement or to particulars affecting its duration are the province of habeas corpus.

*Muhammad v. Close*, 540 U. S. 749, 750 (2004) *(per curiam)* (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). An inmate's challenge to the circumstances of his confinement, however, may be brought under §1983. *Muhammad*, 540 U. S., at 750.

Bustamante does not, in this claim, challenge the State's lawful right to execute him. Rather, he challenges the constitutionality of the specific method of execution used by Texas. Because Bustamante's Eighth Amendment claim challenges the conditions under which Texas intends to carry out his sentence rather than the fact of that sentence, it is properly brought in an action under 42 U.S.C. § 1983 and not in a habeas corpus petition. *See generally*, *Hill* 126 S.Ct. at 2101.

### III.   Evidentiary Hearing

This Court has discretion whether to conduct an evidentiary hearing. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded hearings in federal habeas corpus"); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999). An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *Id.* "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." Rule 8 of the Rules Governing Section 2254 Cases.

Bustamante has requested an evidentiary hearing with respect to each of his claims. Bustamante, however, has not demonstrated any factual dispute that would entitle him to relief. *See Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996). Each of Bustamante's claims can be resolved by reference to the state court record, the submissions of the parties, and relevant legal authority. Accordingly, there is no basis upon which to hold an evidentiary hearing on these claims.

### IV.   Certificate of Appealability

Bustamante has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states

that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997). However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Bustamante's claims. While the issues Bustamante raises are clearly important, the Court finds that each of the claims is foreclosed by clear, binding precedent. Therefore, Bustamante has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court concludes that Bustamante is not entitled to a certificate of appealability.

V.   Order

For the foregoing reasons, it is ORDERED as follows:

1. Respondent Nathaniel Quarterman's Motion for Summary Judgment (Docket Entry 8) is GRANTED;

2. Petitioner Samuel Bustamante's Petition for Writ of Habeas Corpus (Docket Entry 1) is in all respects DENIED, and Bustamante's Petition is DISMISSED WITH PREJUDICE with respect to Count One, and WITHOUT PREJUDICE with respect to Count Two; and

3.	No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

Signed at Houston, Texas on December 6, 2006.

_____
Gray H. Miller
United States District Judge